FRANKLIN DELANO BOULDIN *v.* STATE
OF MARYLAND

[No. 907, September Term, 1974.]

*Decided June 3, 1975.*

The cause was argued before MOORE, LOWE and MASON, JJ.

*Geraldine Kenney Sweeney, Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Gilbert Rosenthal, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Milton B. Allen, State's Attorney for Baltimore City,* and *Peter Semel, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

LOWE, J., delivered the opinion of the Court.

Franklin Delano Bouldin was convicted by a jury in the Criminal Court of Baltimore of possession of heroin with intent to distribute and possession of a manufactured article (a motorcycle) from which the serial number had been removed, defaced or obliterated. He appealed those convictions with the primary thrust of his contention being that the evidence introduced was the fruit of an illegal warrantless search.

Officer Aston testified for the State that he had been routinely called to investigate a serious motor vehicle accident. Upon arrival at the scene he observed a motorcycle lying on its side behind an automobile, the rear of which obviously had been struck by the cycle. Appellant was lying in a semiconscious state about twenty-five feet away from the cycle. He was being attended by personnel from an ambulance already at the scene.

At appellant's request, as he was being placed in the ambulance an attendant picked up appellant's "black leatherette flight bag type of suitcase . . . which had been on the motorcycle with him," and put it in the ambulance with appellant. The ambulance then proceeded with its occupants to the Union Memorial Hospital.

Meanwhile, back at the scene, Officer Aston sought identification of the injured appellant by radioing the license tag number to the Department of Motor Vehicles. In a matter of moments he was advised that the "license plate and the license plate only had been reported stolen under Baltimore City Complaint Number 2K27183. At that time I responded to the hospital . . .

Mr. Semel: Would you stop there, Officer?
The Court: Well, was the defendant subsequently placed under arrest because of this?
A Yes, Your Honor."

Appellant withdrew his initial objection to that testimony when it was argued that such testimony could not be used "to actually prove that [the license plate] was stolen," but

"only to establish why he [appellant] was arrested." The court then explained to the jury why the evidence was admitted:

> "THE COURT: All right. Well, members of the jury, I wanted to explain to you that this last answer was permitted into evidence with regard to the report that the plate was stolen only to explain why the Defendant was arrested by the police officer and for that purpose only."

Before Officer Aston "responded to the Union Memorial Hospital ..." he attempted to ascertain a vehicle identification number from the motorcycle but found that it was not visible. There were "fresh filing marks upon the motor block in the vicinity of where the serial number should have been."

Officer Aston, with a twofold purpose in mind, then went to the hospital where appellant had been taken " ... to check on Mr. Bouldin's condition and to place him under arrest." Upon arrival he found him lying on a roll-type stretcher. His clothes had been removed and placed on a shelf beneath him, along with the black flight bag. Although Mr. Bouldin was unconscious, he was being cleaned up by an attendant preparatory to examination by a doctor. Officer Aston then:

> " ... took the clothing to try and ascertain some identification of Mr. Bouldin looking for a driver's license or any kind of identification. And in the jacket that Mr. Bouldin was wearing in the upper breast pocket I recovered an amount of U.S. currency and a bundle of glassine bags wrapped in a rubber band, a later — a later count revealed twenty glassine bags, each containing a similar looking white powdery substance which I had reason to believe through my — "

Within five minutes of this discovery, an attendant gave Officer Aston some personal effects which had been taken from appellant for safekeeping which included appellant's wallet and identification. In the meantime the officer

telephoned the "on call narcotics officer . . ." for assistance with "a narcotics case at the hospital and would they please respond, which they did."

"A When Officers Dugent and Thornton responded to the emergency room of Union Memorial, I made a more thorough search of the patient's property in company with Officers Dugent and Thornton. One piece of the patient's personal property being the black leatherette flight bag. In one zipper compartment of the flight bag I found an additional thirteen bundles of glassine bags containing a white powdery substance. The total count was three hundred and twenty-four bags in the suitcase along with the twenty bags that were in his coat pocket."

Officer Aston was then asked as a narcotics' expert to explain what he meant by "a bundle."

"A A bundle of heroin is the most common, convenient way that heroin is packaged for I'd say middle level street sale. The addict would rarely see one and would never have occasion to buy one. A bundle would be something that only a dealer would have in his possession. It is a number anywheres from twenty to thirty bags. One bag street level now is about one, one and a half percent heroin content is the average dose for a heroin addict. And, like I said, the average bundle is twenty to thirty bags."

Aside from the previously mentioned withdrawn objection, all of the preceding testimony came in without objection. Most significantly, appellant had at no time filed a motion to suppress. To the contrary appellant had expressly declined to object either to the arrest or the search. Appellant withdrew the objection he had made when the officer was about to testify that he radioed the Department of Motor Vehicles because, in his view, if the evidence were offered "for the purpose of establishing the arrest, of course,

I don't think I would have an objection." The court then asked:

"THE COURT: Well, is there a challenge as to the legality of the arrest and search?
MR. SUTLEY: No. No, not really. But, if it comes in just for that, to establish just an arrest —"

The agreement resulted in the limiting instruction heretofore noted.

Although no motion to suppress was filed and no objection to the arrest or search imposed, when the State reached the point of offering the physical evidence, appellant asked:

"May we approach the bench, Your Honor? "

At the bench, the following colloquy ensued:

"MR. SUTLEY: Mr. Semel I thought was going to introduce this through another officer but he is ready to introduce the evidence now. I would like to question the officer as to the admissibility and perhaps we ought to excuse the jury for four or five minutes.
THE COURT: Well, there is a motion to suppress this evidence or you want to question him first?
MR. SUTLEY: Well, I really wasn't sure how the testimony was going to come out because the officer has refused to speak to me.
MR. SEMEL: He did?
MR. SUTLEY: Yes. So, that is why I — the report doesn't say much at all so that is why I didn't file a frivolous motion, not knowing what he was going to say. But, I will ask a few questions. I do have some concerning his testimony.
MR. SEMEL: Well, I guess that is his right."

The court excused the jury and permitted a lengthy interrogation of Officer Aston by appellant, at the conclusion of which it summarized the evidence so elicited, assumed the existence of either a motion to suppress or

objection, then ruled on it. Among other things the court concluded:

> "Now, these two factors, that is, the stolen tag, or at least what at this point the officer believed to be a stolen tag, plus the obliteration of the number on the vehicle certainly gave him probable cause to place the Defendant under arrest. The officer did not go through all the formalities of the arrest because the man was being worked on on the table in the hospital, but he was for all intents and purposes under arrest in connection with these two items which the officer had found out .... My ruling is that the search of these items was proper because, first of all, it was incident to a lawful arrest; secondly, the officer had the right to try and find out at least from the clothing some identification of the victim; and, thirdly, under the principle of Waugh versus State in 20 Maryland Appellate 682 this black bag or satchel was the kind of object which could very well have been removed and its contents could have been destroyed and under the theory of the Waugh case the officer did have the right to go through that bag and search it under these circumstances. I am not sure whether there — assuming you did make a formal motion to suppress this evidence, Mr. Sutley, I am going to deny the motion and I will overrule the objection."

The State then laid the foundation for introduction of the physical evidence by having the witness identify it. When it was actually offered appellant entered his first objection "for the record." Although no reason was expressed, he disclaimed any concern over the chain of custody of the evidence. The evidence was admitted over the objection.

On appeal it is now claimed that "This evidence, and testimony concerning its seizure . . ." should not have been admitted because the seizure was violative of appellant's Fourth Amendment rights.

Appellee asserts various theories of admissibility

including waiver, emergency search, *Vauss v. United States*, 370 F. 2d 250 (D.C. Cir.) and search incident to a lawful arrest made pursuant to Md. Code, Art. 27, § 594B. Although somewhat analogous, this case doesn't fit any one theory precisely enough to permit us to comfortably rely thereon without further analysis.

In *Floyd v. State*, 24 Md. App. 363, we held that a hospital search of a shooting victim's clothes could be justified either as a search for evidence of the shooting or "to determine the shooting victim's identity." In either case, the officer's actions did not constitute an unreasonable search proscribed by the Fourth Amendment. The issue Judge Gilbert treated in *Floyd* was as here "the reasonableness *vel non*, of the search by [the officer] of the clothing of a . . . victim, at a hospital emergency room where the search is conducted for the purpose of ascertaining the identity of the victim and inadvertently contraband is discovered." While that language is apposite, *Floyd*'s factual premise prevents it from being dispositive. The present search is difficult to justify as seeking identity in a medical emergency as in *Floyd*, when Bouldin was already hospitalized and being prepared for examination before the search began. The absence of medical rationale was obvious from the police officer's testimony where he expressed a vastly different purpose in going to the hospital, *viz.*, to arrest appellant. We shall therefore explore the more persuasive of appellee's arguments — search incident to that arrest.

Central to all of appellant's arguments is his comatose condition at the time of the search. He argues from that fact an arrest could not be effected, although he acknowledges for purposes of argument that the officer had probable cause to arrest, having ascertained appellant's possession of stolen goods under $100, Md. Code, Art. 27, § 341, his possession of a manufactured article from which the serial number has been obliterated not to mention the apparent "speed greater than reasonable under the circumstance" traffic violation. Officer Aston expressly testified that he went to the hospital intending to arrest appellant and in response to the trial court's question he added that he did so. Appellant then asks

how an arrest of an unconscious person is manifested, if indeed an unconscious person can be arrested at all.

A close reading of the record shows that Officer Aston fell just short of consummating an effective arrest under traditional standards. The Court of Appeals

" . . . has built a working definition of an arrest — the detention of a known or suspected offender for the purpose of prosecuting him for a crime. It has been said that there is detention only when there is a touching by the arrestor, although some cases have found a detention where there was no touching but the offender, upon being told that he was under arrest, submitted. Certainly, where there is no touching the intention and understanding of the parties are decisive for, if there is to be an arrest in such case, there must be an intent on the part of one to arrest the other and an intent on the part of such other to submit." *Cornish v. State*, 215 Md. 64, 67-68.

Here there was no evidence of "touching," nor could there have been in appellant's unconscious state "an intent . . . to submit." We pause but to look askance at that latter criterion and wonder how to determine when even a conscious arrestee intends to submit.[1] However, for purposes of a search incident it would seem that technical finding of intent to submit is hardly necessary. The Supreme Court in *United States 'v. Robinson*, 414 U. S. 218, 232 quotes then Chief Judge Cardozo of the New York Court of Appeals on the subject of arrest and search incident thereto. He ascribed little significance to conformity to the technical aspects of an arrest such as a touching, emphasizing rather detention after "grounds for arrest . . . have been discovered":

"Search of the person becomes lawful when grounds for the arrest and accusation have been

---

1. When an arrestee is rendered unconscious by officers due to his violent refusal to submit, must the search incident await his regaining of consciousness and ultimate — if ever — submission?

> discovered, and the law is in the act of subjecting the body of the accused to its physical dominion."

While strict conformity to the technical prerequisites of arrest may be necessary for some purposes, it is clear to us under *Robinson* that grounds for the arrest coupled with the intent of the arresting officer to detain the suspect suffice if the condition of the arrestee precludes the other prerequisites to consummation of a custodial arrest. Obviously if conditions warrant the prerequisite verbal or physical communications, the intent to arrest should be communicated to the arrestee.

Since we hold that appellant had effectively been arrested for the previously enumerated offenses, the subsequent search must find justification in the search incident to arrest exception to the warrant requirement.

At the outset we must decide whether the search of appellant's clothing more closely resembled a search of his "person," *Robinson, supra,* 414 U. S. 218; or a search of the area within his control, *Chimel v. California,* 395 U. S. 752; *Dixon v. State,* 23 Md. App. 19, 26.

Officer Aston went to the hospital to ascertain appellant's identity and to arrest him. Ordinarily, a search of an arrestee's wearing apparel is all that would be required to discover identity. The Supreme Court has recently described, in no uncertain terms, the constitutionally permissible breadth of a search *of the person* incident to arrest:

> "The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect. A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the

fact of the lawful arrest which establishes the authority to search, and we hold that *in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment.*" [Emphasis added] *Robinson,* 414 U. S. at 235.

Here, it was only because of the fortuitous circumstance that appellant had been injured and was unconscious that his clothes were not on his "person," having been removed by hospital personnel. Had his clothes been on his "person" at the time of the search, the rationale of *Robinson* would obviously apply. We think it would be anomalous indeed to hold that the removal of appellant's clothes in an emergency situation somehow extinguished the right to search them incident to his arrest. Confining our reasoning to the unusual facts in the instant case, we hold that Officer Aston's search was within the confines of a search of the "person" and sustainable under *Robinson, supra.* Our decision in no way condones a curious rummaging about to identify a person merely because he is in a comatose state, short of an emergency or the conditions of arrest shown here.

The officer's continued search after finding the initial contraband in appellant's jacket was, as indicated by the trial judge, a reasonable procedure under the principle of *Waugh v. State,* 20 Md. App. 682, rev'd. on other grounds, 275 Md. 22.

### Waiver

We cannot leave this issue without responding to appellee's contention that there was waiver of objection to the introduction of the physical evidence by failure to object to the testimony of the search which uncovered it, if indeed there was not an express waiver. Because of the route we have chosen and the conclusions reached, as well as the "assumption" by the court below of "a formal motion to suppress," we need not decide whether the failure to object

to the testimony of the search and seizure constituted a waiver of the subsequent introduction of the physical evidence. *Holle v. State*, 26 Md. App. 267.

. . .

The remaining issues raised at the request of appellant are without merit.

1. Officer Aston's testimony as to his knowledge of illicit drug traffic came in as expert testimony following his qualification as an expert without objection.

2. The refusal of the court to instruct that appellant's possession of heroin must have been knowing was not error since the Maryland statute does not require intent. The statute was read to jury in any case.

3. The evidence was sufficient for the jury to convict. The evidence showed 20 bags of heroin found in appellant's jacket and 324 bags in his flight bag. With reference to the possession of manufactured product with an obliterated serial number, appellant acknowledged his ownership of the altered motorcycle.

4. Finally the granting or refusal of a new trial is discretionary with the trial court. *Ragler v. State*, 18 Md. App. 671, *cert denied*, 270 Md. 741.

*Judgments affirmed.*